**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GLR-18-0172** |
| | * | |
| **KAMAL DORCHY,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**\*\*\*\*\*\***

**GOVERNMENT'S SUPPLEMENTAL RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO SUPPRESS TRACKING DEVICE "FRUITS"**

Now comes the United States of America by and through its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, and Ayn B. Ducao and Jeffrey J. Izant, Assistant United States Attorneys, and responds in further opposition to the Defendant's motion to suppress further derivative evidence as fruit of the illegal placement of a GPS tracker on the Defendant's vehicle.  *See*  ECF No. 134.

## I.    PROCEDURAL HISTORY

On November 19, 2018, the Defendant moved to suppress certain evidence obtained by the Howard County Police Department ("HCPD") after it installed a tracking device on the Defendant's vehicle while the vehicle was parked on the driveway of his parents' residence in Beltsville, Maryland.  On December 21, 2018, the Government filed its response in opposition to the Defendant's motion.  *See* ECF No. 86.  The Defendant filed a reply on January 22, 2019.  *See* ECF No. 95.

The Court conducted a hearing on the Defendant's motion on April 26, 2019.  During the hearing, the Court found that: (a) HCPD officers entered onto curtilage when they installed the device, requiring a warrant; (b) the Maryland District Court Order authorizing installation of the tracking device did not incorporate HCPD's request to enter onto private property to install the

device; (c) HCPD officers were not entitled to rely on the Order in good faith pursuant to *United States v. Leon*, 468 U.S. 897 (1984); and (d) accordingly, HCPD's installation of the tracking device was accomplished by an unlawful search.

The Court continued the hearing to May 9, 2019. In advance of the continued hearing, the government moved the court to reconsider its good-faith ruling on the ground that HCPD officers were entitled under *Davis v. United States*, 564 U.S. 229 (2011), to rely in good faith on binding appellate precedent for the principle that a separate warrant was not required to enter onto a private driveway to install a court-authorized tracking device. *See* ECF No. 123.

At the May 9, 2019, hearing, the Court denied the government's motion for reconsideration. Furthermore, the Court granted the Defendant's motion to suppress the following items as "fruits" of the unlawful installation: (1) certain tangible evidence recovered from Rooms 524 and 528 of the College Park Days Inn; and (2) tangible evidence recovered from the Defendant and his vehicle during a traffic stop on July 27, 2017. The Court declined, however, to suppress evidence that HCPD obtained from: (3) 2204 North Charles Street, Unit B, Baltimore, Maryland, under the independent source doctrine; and (4) the Defendant's post-arrest statements, which the Court found were sufficiently attenuated from the unlawful search.

At the conclusion of the hearing, the Court ordered the government to file supplemental briefing addressing the question whether the Court's suppression order should extend to (i) the cell phones recovered from the sex trafficking victims located at the College Park Days Inn, and (ii) the victims' anticipated trial testimony. The government filed its supplemental brief on June 3, 2019. *See* ECF No. 135.

The Defendant indicated at the May 9, 2019 hearing that he intended to file briefing regarding his motion to suppress other evidence as fruit.  The Defendant filed his brief also on June 3, 2019.  *See* ECF No. 134.  This response addresses the Defendant's filing at ECF No. 134.

## II.    ARGUMENT

The Defendant argues that four categories of information should be suppressed as illegal "fruit" emanating from the Court's order finding that HCPD unlawfully installed a GPS tracker on the Defendant's vehicle: (1) observations by law enforcement at the College Park Days Inn on July 27, 2017; statements of witnesses interviewed at the College Park Days Inn on July 27, 2017; and registration information for Rooms 524 and 528 at College Park Days Inn obtained by law enforcement on July 27, 2017; (2) information provided via subpoena from Comcast, Verizon, Google, Pinger, Sprint, T Mobile, TracFone, AT&T, Cricket, and other companies resulting from information obtained from cell phones recovered from the Defendant's Cadillac Escalade; (3) evidence obtained pursuant to a search warrant executed at 11708 Ellington Drive, Beltsville, MD on November 21, 2017; and (4) evidence returned from search warrants obtained in December 2019 for various email and social media accounts, and information obtained from subpoenas to Backpage.

As discussed more fully below, in the first category of evidence that the Defendant seeks to suppress, the Government concedes that any testimony by law enforcement as to their personal observations at the College Park Days Inn on July 27, 2017 is subject to suppression under the Court's prior orders.  However, the Government opposes the Defendant's motion as to the rest of the Defendant's first category, as well as the second, third, and fourth categories.  Because the Government's discussion regarding the Defendant's third and fourth identified categories informs

the Government's response as to the Defendant's second identified category, the Government will discuss the Defendant's second identified category as the last section below.

>    **A.     The Defendant's first identified category:  while the Government concedes that law enforcement testimony regarding observations at the College Park Days Inn occurring on July 27, 2017 is subject to suppression, the other evidence identified in the Defendant's first category should not be suppressed.**

The Government concedes that HCPD officers and other law enforcement who were at the College Park Days Inn on July 27, 2017 would not have been at that particular hotel at that particular time but for the vehicle tracker.  Therefore, any testimony by law enforcement officers regarding their observations at the College Park Days Inn on July 27, 2017 is subject to suppression pursuant to the Court's prior orders.

However, for the reasons discussed in the government's prior filings at ECF Nos. 86 and 135, the testimony of the witnesses—including the minor victim—encountered by law enforcement at the College Park Days Inn on July 27, 2017 should not be suppressed.

Moreover, registration information regarding the Defendant that was obtained from the College Park Days Inn on July 27, 2017 should not be suppressed, because it is more likely than not that law enforcement ultimately would have discovered this evidence in the absence of the unlawful search.  *See United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (observing that government may use information "obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would 'ultimately or inevitably' discovered the evidence by 'lawful means'" (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984))).

First, days before law enforcement had even applied for the tracking warrant, Victim 1 told law enforcement on July 23, 2017, that the Defendant trafficked women in Beltsville and College

Park, Maryland, and used the name "Kamal Goodwin." *See, e.g.*, ECF 21-7, at 2. Victim 1 also told officers that the Defendant and his victims "always stay in Days Inn hotels" (or—less often— Super 8 hotels, if a victim has not yet "proven" herself). *See, e.g.*, ECF 21-2, at 4 (SW07-0004). On July 23, moreover, law enforcement confirmed that the Defendant was not currently staying at the Laurel, Maryland, Days Inn—the Days Inn that was closest to the Turf Motel, where officers had interviewed the victim. *See* ECF 23-5 (HCPD-BD1-0018). Finally, in a subsequent interview on July 25, Victim 1 confirmed that photographs shown to her by law enforcement depicted other victims of the Defendant, and law enforcement had already obtained online advertisements for these victims in which the advertised location was College Park, Maryland. Thus, well before the Defendant's vehicle was tracked to the College Park Days Inn, law enforcement already had more than sufficient reason to believe that the Defendant was trafficking victims there and inevitably would have learned and obtained information about the Defendant's registration information either by physically visiting the College Park Days Inn (as it had in Laurel) or by issuing a subpoena to the College Park Days Inn. This conclusion clearly is not speculative because law enforcement did, in fact, obtain registration information regarding the Defendant from the Laurel Days Inn— which was in no way obtained via the vehicle tracker. *See* registration information from the Laurel Days Inn attached as Exhibit A.

      **B.**    **The Defendant's third identified category: evidence obtained as a result of a search warrant executed at 11708 Ellington Drive, Beltsville, MD on November 21, 2017 should not be suppressed because the search warrant affidavit still contains probable cause even with excision of the two paragraphs that arguably contain discussion of illegally obtained evidence.**

On November 20, 2017, Homeland Security Investigations ("HSI") Task Force Officer and Prince George's County Police Detective Jose M. Lopez-Berrios obtained a search warrant for the residence located at 11708 Ellington Drive, Beltsville, Maryland, and the search warrant was

executed on November 21, 2017.  *See* search warrant and underlying application and affidavit attached as Exhibit B.  The Defendant now argues that evidence obtained from this search warrant should be suppressed as "fruit."

"[T]he case law establishes that, even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause."  *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995).  That is the case here.  *Cf. id.* ("Thus, unless the tainted information is so important that probable cause did not exist without it, the warrant will be deemed valid." (internal citation omitted)).

For the challenged search warrant, the tainted information was incorporated into paragraph 8 (which discusses installation and use of the vehicle tracker) and, arguably, paragraph 9 (which discusses interviews with the two adult female victims and one juvenile female victim located at the College Park Days Inn in rooms 524 and 528 on July 27, 2017).  But probable cause remains even after these two paragraphs are excised.  First, the affidavit establishes a clear connection between the Defendant and the property to be searched in the absence of paragraphs 8 and 9.  In paragraph 10, the affidavit states that the Defendant listed 11708 Ellington Drive, Beltsville, Maryland, as his address during numerous police encounters; checks with credit unions and utilities list the Defendant's address as 11708 Ellington Drive, Beltsville, Maryland; and real property checks list 11708 Ellington Drive, Beltsville, Maryland, as belonging to the Defendant's parents.  This last fact was specifically confirmed during the April 26, 2019, motions hearing when the Defendant's father testified that 11708 Ellington Drive, Beltsville, Maryland, was his family home and that the Defendant stayed there.

The affidavit also provided a sufficient basis to believe that evidence of a crime would be found there.  Specifically, the affidavit explained that DC, Victim 1, gave law enforcement the following information about the Defendant: (1) Victim 1 had met the Defendant nine months ago; (2) the Defendant became Victim 1's pimp and took 50% of the money earned from prostitution dates from Victim 1 and the other victims; (3) the Defendant posted ads on Backpage.com; (4) the Defendant picked the names for the victims, including "Truth", "Priceless", "Ariel" and others; (5) the Defendant had been a pimp for 5 years; (6) the Defendant had a juvenile victim within the last three months; (7) Victim 1 had numerous prostitution dates in Howard County at the Defendant's direction; (8) the Defendant paid for hotels using the name Kamal Goodwin; (9) the Defendant would photograph his victims for their prostitution ads; (10) the Defendant typically stayed in hotels/motels or with his mother Lucretia Dorchy; (11) the Defendant told Victim 1 that he got into an argument with his mother because he was posting Backpage.com ads for prostitution for his victims from a computer in her residence and (12) the Defendant had stolen Victim 1's phone.  *See* affidavit at 4-7.  The affidavit further stated that Howard County Police Detective Kalle James-Wintjen had observed Backpage.com ads for prostitution posted after July 24, 2017 using the same phone number that had been previously used to post ads for Victim 1.  *See id.* at 7. Thus, Detective James-Wintjen was able to corroborate an important detail of Victim 1's account: Specifically, the Defendant was posting Backpage ads on her behalf—because even after the phone was taken from Victim 1, it was still being used to post Backpage ads. Finally, the affidavit represented that persons involved in sex trafficking crimes keep records and photographs of their activities in locations they consider safe, such as their residences.  *See id.* at 9-10.

The Defendant claims that such information provided by Victim 1 is insufficient to support probable cause because of the report of Howard County Police Officer Candace Futrell.  The

Defendant's argument appears merely to rehash the same *Franks* argument this Court has already rejected. *See generally Franks v. Delaware*, 438 U.S. 154 (1978). And the Fourth Circuit has declined to apply the "collective knowledge doctrine" to "impute knowledge of facts to an officer seeking a warrant merely because such facts are accessible to the law enforcement community at large." *United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011). The Fourth Circuit's rejection of this doctrine is particularly relevant here, where the affiant, HSI Task Force Officer and Prince George's County Police Detective Lopez-Berrios, did not even belong to the same agency as Officer Futrell. In any event, the Defendant made this same argument in his *first Franks* motion, which the Court denied.

The Court should again dismiss this challenge because Officer Futrell's *conclusions* about Victim 1 do not defeat probable cause. In her report, Officer Futrell stated that:

> Investigation of the reported harassment revealed, via [Victim 1]'s state cell phone before it was stolen, Goodwyn-Dorchy was not harassing her. In fact, from the texts exchanged between the two it appeared [Victim 1] was harassing Goodwyn-Dorchy. Additionally, there were no credible threats made regarding violence. The only threats observed in [Victim 1]'s cell phone were Goodwyn-Dorchy threatening to contact CPS. [Victim 1] provided Goodwyn-Dorchy's cell phone number . . . I conducted computer checks using the phone number provided by [Victim 1] and located Goodwyn-Dorchy's identifying information to include a booking photo. [Victim 1] positively identified Goodwyn-Dorchy by his booking photo as her previous pimp. There were no witnesses to the alleged theft of [Victim 1]'s cell phone.

*See* ECF 134-6 at 2. Officer Futrell's report did not provide definite proof that Victim 1 was not credible—merely her conclusions that "it appeared" that Victim 1 was harassing Goodwyn-Dorchy and that "there were no credible threats made regarding violence." In any event, Officer Futrell's report also shows that the Defendant *did* threaten Victim 1, a mother with children, with calling Child Protective Services or CPS. And Officer Futrell was able to locate a booking photo

of the Defendant based on information provided by Victim 1.[1]  Both corroborated Victim 1's claims.

Accordingly, this case is like *United States v. Tillage*, 404 F. App'x 722 (4th Cir. Dec. 6, 2010) (unpublished), where the Fourth Circuit affirmed the district court's denial of the defendant's *Franks* motion.  In reaching this decision, the court reasoned that, "on consideration of the omitted material, the fact that another officer on the scene did not smell marijuana [did] not defeat the probable cause established by Sandlin's observations."  404 F. App'x at 724.  Similarly, here, Officer Futrell's conclusions about Victim 1's account did not defeat the probable cause established by the detailed information provided by Victim 1 to law enforcement, much of which was later corroborated.

In *United States v. Perez*, 393 F.3d 457 (4th Cir. 2004), the Fourth Circuit discussed probable cause:

> Because "it is well settled that probable cause may be founded upon hearsay and information received from informants," . . . a judicial officer's assessment of probable cause based upon the totality of circumstances must include a review of "the veracity and basis of knowledge of persons supplying hearsay information . . . . "  Certainly, an informant's reliability may also be bolstered by the degree to which the informant's story is corroborated . . . But "there is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible."  The officer applying for the warrant "need not entirely eliminate the risk that an informant is lying or in error."

393 F.3d at 461–62 (internal citations omitted).  Moreover, there "is a substantial difference between an informant who deals with the authorities in person an anonymous phone caller" since, "[u]nlike an anonymous tipster, an informant who meets face-to-face with an officer

---

[1] There were no indications of concerns about Victim 1's credibility in the report of the first responding officers Sean Pepper and Jeffrey Dorsey.

provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement." *Id.* at 462 (internal citations omitted).

Furthermore, "[a]n informant's truthfulness and reliability, while certainly relevant, are only two factors among many that courts may consider.  A very detailed tip, for example, may compensate for questions about the informant's reliability, and a tip that relies on hearsay may be deemed reliable if police later can corroborate it."  *United States v. White*, 549 F.3d 946, 950 (4th Cir. 2008).  "To require a specific type of corroboration such as an independent investigation would violate the flexibility emphasized in [*Illinois v.] Gates* [462 U.S. 213 (1983)]."  549 F.3d at 950.  An informant also may be deemed reliable through "independent police corroboration of the information provided by an informant" or by an "admission against penal interest."  *United States v. Bishop*, 264 F.3d 919, 925 (9th Cir. 2001); *see also United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004) ("Admissions of crimes, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search" (internal citation omitted)); *United States v. Golay*, 502 F.2d 182, 186 (8th Cir. 1974) (reasoning "the credibility and reliability of the informant was adequately established by the disclosure in the affidavit that the informant was an admitted participant in the crime and therefore an eyewitness to most of the acts constituting the crime as described in the affidavit").

Here, Victim 1's reliability was established by the following:  (1) Victim 1 gave a very detailed account of the Defendant's human trafficking activities based on her own personal knowledge due to her own interactions with the Defendant who served as her pimp; (2) Victim 1's admissions regarding her own prostitution activities were statements against her own penal interest; and (3) much of Victim 1's account was corroborated.

First, as described in pages 4-7 of the affidavit, Victim 1 provided law enforcement with a highly detailed first-person account of the Defendant's human trafficking activities, which included acting as a pimp for the victim.  Second, Victim 1 admitted that, in connection with the Defendant acting as her pimp, she herself went on prostitution dates, thus admitting that she was at least guilty of violations of Maryland state law.[2]  Finally, Victim 1's account was corroborated in that Detective James-Wintjen found that a phone number provided by Victim 1 was used in online ads for prostitution involving another victim—posted *after* Victim 1 was interviewed by Howard County Police on July 24, 2017.  *See* affidavit at ¶ 7; *see also Gates,* 462 U.S. 213, 214, n. 13 (1983) (stating "innocent behavior frequently will provide the basis for a showing of probable cause"); *United States v. McCraw*, 920 F.2d 224, 228 (4th Cir. 1990) (finding corroboration of informant's tip via innocent behavior could support probable cause).

### C.   The Defendant's fourth identified category—evidence from search warrants issued for email and social media accounts and subpoenas to Backpage—should not be suppressed.

In his fourth category of material that the Defendant seeks to suppress, the Defendant identifies both information subpoenaed from Backpage as well as search warrants issued in December 2017 for email and social media accounts.  The Court should deny this part of his motion, too.  As noted above, "the case law establishes that, even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause."  *Simmons*, 47 F.3d at 1378.  Moreover, the "government may use information 'obtained from an otherwise unreasonable search if it can established by a preponderance of the evidence that law

---

[2] Md. Code Ann., Crim. Law § 11-306(a)(1) provides that a person may not knowingly "engage in prostitution or assignation by any means."  Under § 11-306(b), violation of the statute is a misdemeanor; the maximum penalty is one year imprisonment, a fine under $500, or both.

enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means'" *Bullette*, 854 F.3d at 265 (internal citation omitted).  Additionally, "the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate independent source."  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)).

On December 5, 2017, HSI Special Agent Leah Martinez obtained federal search warrants for a Facebook account, Instagram account, Gmail accounts, Tumblr accounts, and a LinkedIn account (see search warrants, applications, and affidavit attached as Exhibit C).[3]  On December 12, 2017, Special Agent Martinez obtained a federal search warrant for the Facebook Account User ID: 100009660541762 / Larry.Doughty.52 (User Name:  Larry Doughty) (*see* search warrant, application and affidavit attached as Exhibit D).[4]  The Defendant seeks to suppress evidence obtained as a results of these search warrants as "fruit."  The Defendant also seeks to suppress "information obtained from subpoenas to Backpage, which were likewise obtained by virtue of already-suppressed cell phone evidence."  *See* ECF No. 134 at 9.  The Court should reject these arguments.

---

[3] In his motion, the Defendant erroneously identified these search warrants as being issued on December 13, 2017.  While the search warrants were docketed on December 13, 2017 by the Clerk's Office, the warrants were in fact issued on December 5, 2017.  *See* warrants at Exhibit C.

[4] HSI had obtained a search warrant for the Facebook Account of User Name: Larry Doughty in connection with the December 5, 2017 search warrant application.  However, after obtaining that search warrant, HSI determined that the incorrect User ID number was listed for this Facebook account and so sought a search warrant with the corrected User ID number for the Facebook Account of User Name: Larry Doughty on December 12, 2017.  The December 12, 2017 search warrant affidavit attached and incorporated the December 5, 2017 search warrant affidavit for the purpose of establishing probable cause.  *See* December 12, 2017 affidavit at ¶ 4 attached at Exhibit D.

> 1.  *Information obtained via subpoenas to Backpage should not be suppressed because subpoenas to Backpage were based on information that was independent of the vehicle tracker or would have been inevitably discovered.*

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). "Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." *Adkinson*, 191 F. Supp. 3d at 568 (citing *United States v. Matlock*, 415 U.S. 164, 177-78 n. 14 (1974)). Here, the Defendant baldly states that information subpoenaed from Backpage was "obtained by virtue of already-suppressed cell phone evidence" but cites no documents or exhibits to support that assertion. Thus, the Defendant has not met his burden of establishing a basis for his suppression motion.[5] But even if the Court were to determine that the burden had shifted to the Government, all of the Backpage ads located during this investigation were either located using information that was obtained independently from the vehicle tracker or that inevitably would have been discovered.

When Victim 1 was first interviewed by HCPD, she provided detailed information regarding the Defendant's trafficking activities, including that he used Craigslist and Backpage, used the email address delmarva90@gmail.com to post online ads, and provided certain phone numbers. *See* Report by Detective James-Wintjen attached as Exhibit E at 1-3 and 7. During the investigation, Detective James-Wintjen had access to both the website Backpage.com and a law enforcement investigative tool known as Spotlight, which is a web-based platform that assists law enforcement in identifying sex trafficking victims by, in part, collecting online prostitution

---

[5] As a result, the government disputes the Defendant's assertion that, without qualification, it "is the Government's burden to establish that the subpoenaed Backpage ads are not derivative of the illegally placed GPS tracker." ECF No. 134 at 8.

advertisements, such as those that had been placed on Backpage.com, and providing tools to search those advertisements.  Thus, by the time of Detective James-Wintjen's second interview of Victim 1 on July 25, 2017, Detective James-Wintjen was able to show Victim 1 several Backpage.com ads that Detective James-Wintjen had located, and Victim 1 was able to identify the persons in these ads.  *See id.* at 5-7; s*ee also* Exhibit F for the ads that Detective James-Wintjen showed to Victim 1.  As a result of this information, law enforcement was able to obtain all of the relevant information necessary to obtain the subpoenaed Backpage ads without relying on any information derived from the vehicle tracker.

> 2.    *Evidence from search warrants issued in December 2017 for email and social media accounts should not be suppressed because these accounts were or would have been identified independently from information resulting from the vehicle tracker and there was sufficient probable cause to search these accounts.*

In the December 5, 2017, affidavit attached as Exhibit C, information obtained from cell phones recovered from the Defendant's vehicle on July 27, 2017, and which the Court has ordered suppressed, is discussed at paragraphs 13 and 14.  And information obtained by law enforcement from the three females recovered at the College Park Days Inn on July 27, 2017, is included in the December 5, 2017, affidavit at paragraphs 8, 10 and 11.

Assuming, *arguendo*, that the information contained in paragraphs 8, 10 and 11 must also be excised,[6] the affidavit nonetheless contained sufficient probable cause that the Defendant was engaged in sex trafficking and related offenses, as discussed below.  Specifically, the affidavit contained a detailed discussion of information provided by Victim 1, which consisted of a highly

---

[6] The Defendant also asserts that paragraph 12 of the December 5, 2017, affidavit, which discuss Backpage subpoena results, should be excised because it is derivative of the illegally placed vehicle tracker.  *See* ECF No. 134 at 8.  As the Government showed in the previous section, however, the Backpage subpoena results are *not* derivative of the vehicle tracker.

detailed first-person account of the Defendant's human trafficking activities, which included acting as a pimp for the Victim 1. *See* December 5, 2017 affidavit at 5-10 attached as Exhibit C.

### a. Facebook account

Regarding the Facebook account, paragraph 15 of the December 5, 2017, affidavit demonstrates the connection between the Facebook account and the Defendant, including that there were two photos of the Defendant on the profile page as well as two videos showing the Defendant. The Facebook account videos and photos also show the phone shop, which was described by Victim 1. *See* December 5, 2017 affidavit at 9 and 20. Moreover, paragraph 16 explains that perpetrators of sex trafficking crimes often take photos and videos of their crimes and display these photos and videos on social networking sites including Facebook and Instagram. *See* December 5, 2017 affidavit at 20. Thus, even with the excision of paragraphs 8, 10, 11, 13 and 14, the December 5, 2017, affidavit still contains sufficient probable cause to support the challenged Facebook search warrant. And a simple Facebook search for "Kamal Dorchy" leads to the Facebook account that was searched; accordingly, the account itself would inevitably have been discovered. As paragraph 16 in the affidavit explains, perpetrators of sex trafficking crimes often take photos and videos of their crimes and display these photos and videos on social networking sites including Facebook and Instagram. Thus, any sex trafficking investigation routinely involves trying to identify social media accounts used by perpetrators.

### b. Instagram account

Paragraph 15 of the December 5, 2017, affidavit states that the profile photo for the Instagram account depicts the Defendant. *See* December 5, 2017, affidavit at 20. As the Government explained above, paragraph 16 of the December 5, 2017, affidavit explains that perpetrators of sex trafficking crimes often take photos and videos of their crimes and display these

photos and videos on social networking sites including Facebook and Instagram.  *See id.*  Thus, even with the excision of paragraphs 8, 10, 11, 13 and 14, the December 5, 2017, affidavit still contains sufficient probable cause to support the challenged Instagram account.  And a simple Facebook search for "Kamal Dorchy" leads to the searched Facebook account.  "G Legacy," moreover, is one of the nicknames listed on the Facebook account.  Accordingly, the searched Instagram account inevitably would have been discovered because an Instagram search for "G Legacy" leads directly to it.  As noted above, any sex trafficking investigation routinely involves trying to identify social media accounts used by perpetrators.

*c.   Google accounts*

The December 5, 2017, affidavit supported search warrants for the following Google accounts: kamalgoodwyn@gmail.com; tammyeaton1991@gmail.com; onthehush893@gmail.com; delmarva90@gmail.com; and marytaylor19899@gmail.com.

i.   kamalgoodwyn@gmail.com

As demonstrated above, the Facebook account inevitably would have been discovered and searched.  The Facebook account return, moreover, included a message in which someone asked the Defendant for his email address; in response, the Defendant provided the email address kamalgoodwyn@gmail.com.  Accordingly, this email account inevitably would have been discovered. Moreover, Victim 1 described to law enforcement that the Defendant posted Backpage ads, primarily but *not exclusively* using another email address.  Therefore, the Defendant used other email addresses to post Backpage ads.  *See* December 5, 2017 affidavit at 7.  As such, there would have been probable cause to search this email account.

16

ii.      tammyeaton1991@gmail.com

As described in the Government's brief filed June 3, 2019, HCPD Detective James-Wintjen used Spotlight to locate certain ads on Backpage that she saved on July 26, 2017.  *See* ECF No. 135 at 6.  One of those saved Spotlight ads included an ad for "Becky."  *See* ECF No. 135-4 (Exhibit D) at 3.  The phone number associated with the ad for "Becky" is 410-417-7234. *See id.*  On or about August 8, 2017, a subpoena was sent to Backpage for any ads associated with certain phone numbers, including 410-417-7234.  The ads provided by Backpage associated with phone number 410-417-7234 contained the email address tammyeaton1991@gmail.com. Thus, the information that led law enforcement to this email address was completely independent from the vehicle tracker.

iii.      onthehush893@gmail.com

Another Spotlight ad that was saved by Detective James-Wintjen on July 26, 2017, was for "Rain, Lexi and Dee."  *See* ECF No. 135-4 (Exhibit D) at 4.  The phone number associated with this ad is 240-249-5710.  The subpoena sent to Backpage on or about August 8, 2017, included a request for any adds associated with phone number 240-249-5710.  The ads provided by Backpage associated with phone number 240-249-5710 contained the email address onthehush893@gmail.com.  Thus, the information that led law enforcement to this email address also was completely independent from the vehicle tracker.

iv.      delmarva90@gmail.com

 The December 5, 2017, affidavit relayed that Victim 1 stated that the Defendant posted all of the Backpage.com ads for his victims primarily using the account delmarva90@gmail.com. Thus, even with the excision of paragraphs 8, 10, 11, 13 and 14, the December 5, 2017, affidavit still contains probable cause sufficient to support the search of this Google account, too.

17

v.      marytaylor19899@gmail.com

As noted in subargument section (i) above, the email address kamalgoodwyn@gmail.com would have been inevitably discovered by law enforcement.  On January 10, 2017, the email account kamalgoodwyn@gmail.com sent an email to marytaylor19899@gmail.com with images of a suspected trafficking victim.  Thus, law enforcement would have inevitably discovered the marytaylor19899@gmail.com email account and had probable cause to search this account.

d.  *Tumblr accounts*

As the Government explained in its June 3, 2019, filing, HCPD had located Backpage advertisements depicting each of the victims before they were encountered by law enforcement at the Days Inn on July 27, 2017, including Victim 2, the minor victim.  *See* ECF 135 at 3-6. Paragraph 12 of the December 5, 2017, affidavit states that the challenged Tumblr accounts were specifically listed in the Backpage ads associated with this investigation.  *See* December 5, 2017 affidavit at 18.  All of these Backpage ads also concern Victim 2.  Thus, law enforcement had an independent source for the Backpage ads that inevitably would have led to identifying the searched Tumblr accounts.

e.  *LinkedIn account*

Footnote 13 of the December 5, 2017, affidavit explained that the Defendant promoted his "phone shop" and other business ventures on his LinkedIn account, and Victim 1 had also described the Defendant's "phone shop."  *See* December 5, 2017, affidavit at 9.  Thus, even with the excision of paragraphs 8, 10, 11, 13 and 14, the December 5, 2017, affidavit still contained probable cause sufficient to support the LinkedIn account search.  Moreover, a simple Google search for "Kamal Dorchy" returned the LinkedIn account; accordingly, this account inevitably would have been discovered.

**D.      The Defendant's second identified category—information obtained from phone companies and internet service providers such as Google—should not be suppressed, with the possible exception of four identified numbers.**

The Defendant contends that information provided via subpoena from Comcast, Verizon, Google, Pinger, Sprint, T Mobile, TracFone, AT&T, Cricket, and other companies resulting from information obtained from cell phones recovered from the Defendant's Cadillac Escalade should be suppressed.  As discussed above, information from Victim 1 as well as use of Backpage and the investigative tool Spotlight led Detective James-Wintjen to certain Backpage ads that contained phone numbers and email addresses.  These phone numbers served as the bases for subpoenas to  Comcast, Verizon, Google, Pinger, Sprint, T Mobile, TracFone, AT&T, Cricket, and other companies.  Because law enforcement had an independent source for the information that led it to issue these subpoenas, the resulting records should not be suppressed.[7]

---

[7]  There is one phone number that investigators cannot currently trace to an independent source or conclude they would have inevitably been discovered.  This phone number is (240) 527-6422.  Thus, the government anticipates that, on the next motions date, it likely will concede that records resulting from subpoenas regarding this phone number should be suppressed.

### III.     <u>CONCLUSION</u>

For the reasons set forth above and in its prior filings, the Government respectfully requests that the Court deny the Defendant's motion to suppress further derivative evidence as fruit of the illegal placement of a GPS tracker on the Defendant's vehicle at ECF No. 134.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:     _____/s/_____
Ayn B. Ducao
Jeffrey J. Izant
Assistant United States Attorneys
36 South Charles Street, Suite 400
Baltimore, Maryland 21201